**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**AIKEN DIVISION**

| | | |
|---|---|---|
| THOMAS A. MOORE, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:04-376-RBH-BM |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| RURAL HEALTH SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This action has been filed by the Plaintiff alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., and 42 U.S.C. § 1981. Plaintiff also alleges state law causes of action for breach of contract, defamation per se, invasion of privacy, and intentional infliction of emotional distress. In its responsive pleading, Defendant asserts counterclaims against the Plaintiff for breach of the covenant not to compete, restitution, and abuse of process.

Defendant filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on February 22, 2005. The Plaintiff also filed his own motion for summary judgment on that same date. Opposition memoranda were filed by both parties, as were reply memoranda. Both motions are now before the Court for disposition.[1]

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The parties have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

1



## Background and Evidence[2]

The Defendant (hereinafter "the Center") provides health care to low income residents of Aiken County and surrounding areas. The Center is run by a Chief Executive Officer (CEO), who is responsible for the hiring, supervision, and firing of all Center staff. During the time period relevant to this action, the Center's CEO was Tony Dunn (white male). The CEO reports to a fifteen (15) member Board of directors, which was during the relevant time period chaired by Louisiana Wright (African-American Female).

Plaintiff (a white male) was hired by Dunn to serve as medical director of the Center on or about February 28, 2002. Plaintiff was given a written contract, which provided for his employment for twelve (12) months at a salary of one hundred and forty thousand ($140,000.00) dollars. See Plaintiff's Exhibit G; Defendant's Exhibit 7.

It is undisputed that Dunn and the Board were frequently at odds over the operation of the Center. The United States Department of Health and Human Services (HRSA), the Center's primary source of grant funds, had even sent consultants to Aiken to perform assessments on the relationship between the Board and the CEO. These assessments were performed in the months leading up to Plaintiff's hiring. See Defendant's Exhibits 1 & 2; Plaintiff's Exhibits A & B. Approximately seven (7) weeks after Plaintiff began his employment with the Defendant, he attended a meeting of the Board on April 22, 2002, where it was apparent that the Board was seriously considering terminating Dunn as CEO. Plaintiff's Deposition, p. 42. Plaintiff testified that the Board went into executive session, and that he entered the executive session and asked Wright

---

[2]With respect to each motion for summary judgment, the facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the party opposing the summary judgment motion. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).



if he could speak. Id, pp. 43-44.  Plaintiff testified that he told the Board that Dunn was a "good man", that the Center's "programs were being held together by Tony's vision and his energy, and that if he left, I would go." Id, p. 45.  Plaintiff testified that he later observed Dunn being escorted out by the Sheriff, and that he [Plaintiff] got into his car and went home. Id, p. 47.

Plaintiff testified that he went to work the next day, and that while there was "a lot of upset-ness with the abrupt changes....I had come to a decision that I needed to stay." Id, p. 52. Later that day, Plaintiff met with two Board members, Dr. Jack Hamrick (white) and Rev. Eugene Sutton (African-American).  Plaintiff testified that he informed Hamrick and Sutton that he was going to stay, and also asked why Dunn had been fired.  Plaintiff testified that in response, Hamrick indicated that Plaintiff had been "hired illegally in his view, that the Board had never interviewed me or didn't know anything about my contract. That in fact that my contract would be placed before the Board and that I would be re-interviewed by the Board...." Id, pp. 54-55.  Plaintiff testified that Sutton then "launched into that I had better be careful to the affect that I was a racist, and that I might not be there much longer because I had been violating the civil rights of the employees there at that Center." Id, p. 55.

Plaintiff believed he would be fired if he did not resign,[3] so the next day, April 25, 2002, Plaintiff typed a letter stating that, pursuant to his conversation with Hamrick and Sutton, he was tendering his resignation effective July 24, 2002 (the 90 day notice period set forth in his contract).  Defendant's Exhibit 12.  Sutton was present that day, and when Plaintiff gave Sutton his letter, Sutton handed him an already prepared memorandum from Wright indicating that the Board

---

[3]Defendant's evidence, considered in the light most favorable to the Defendant (for purposes of Plaintiff's motion for summary judgment), is that Plaintiff voluntarily resigned, both orally at the Board meeting, and two days later in writing. See also, Section I(2), infra.



accepted Plaintiff's resignation and that he would be paid for the next ninety (90) days minus any

indebtedness to the Center. Defendant's Exhibit 13. Plaintiff testified that when he started to clean

out his office, Sutton returned and accused him of stealing, "shouting down the hall that I was a

thief," and that a sheriff's deputy was called to escort him from the premises. Id, p. 56. In a

subsequent letter dated May 14, 2002, Plaintiff was advised by Wright that the Board had decided

to suspend any additional payments to him because Plaintiff had violated his contract. Defendant's

Exhibit 14.

On October 30, 2002, Plaintiff filed a charge of discrimination with the South

Carolina Human Affairs Commission (SCHAC)[4], alleging, inter alia, that he had been discriminated

against on the basis of his race when he was terminated by the Defendant. On September 30, 2003

the EEOC issued a determination finding reasonable cause to believe that Plaintiff had been

discriminated against on the basis of his race with respect to his discharge, and after receiving a right

to sue letter, Plaintiff filed this action in United States District Court. See Plaintiff's Exhibits M, N

& O.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as

---

[4]As South Carolina is a deferral state, Plaintiff could file his administrative claim with SCHAC, instead of with the Equal Employment Opportunity Commission (EEOC). Nelson v. Lockheed Missiles and Space Co., No. 97-1430, 1997 WL 727609 at **1 n. 1 (4th Cir. November 24, 1997); E.E.O.C. v. Hansa Products, Inc., 844 F.2d 191, 192 n. 1 (4th Cir. 1988) (quoting 42 U.S.C. § 2000e-5(e)) ["A deferral state is one 'which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice.'"]; see S.C.Code Ann. § 1-13-90, et. seq., as amended.

4



a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

## I.

### (Race Discrimination Claim)

Plaintiff alleges in his first and second causes of action that he was subjected to disparate treatment and was terminated by the Defendant because of his race in violation of Title VII and § 1981. The standards applicable to lawsuits under § 1981 and Title VII are basically the same.[5] Ross v. Kansas City Power & Light Co., 293 F.3d 1041, 1050 (8th Cir. 2002) ["In analyzing a claim...under section 1981, we apply the same standards as in a similar Title VII claim."]; Long v. First Union Corp. of Virginia, 894 F.Supp. 933, 945 (E.D.Va. 1995). See also Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-1019 (4th Cir. 1999) [holding that even an at-will employment relationship is contractual and may serve as a predicate for a § 1981 claim]. Therefore, the undersigned has discussed these two statutory claims together.

Plaintiff's disparate treatment claim requires proof of intentional discrimination, either by direct evidence or by the structured procedures set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248

---

[5]One difference between Title VII claims and claims brought under § 1981 is that individual liability is possible under § 1981. Dalton v. Jefferson Smurfit Corp., 979 F.Supp. 1187, 1201-1203 (S.D.Ohio 1997); cf. Lissau v. Southern Foods Serv., Inc., 159 F.3d 177, 180-181 (4th Cir. 1998). However, no individual liability is asserted in this cause of action. See also Gairola v. Virginia Dep't of General Servs., 753 F.2d 1281, 1285 (4th Cir. 1985); Abasiekong v. Shelby, 744 F.2d 1055, 1058 (4th Cir. 1984).



5

(1981). Plaintiff has not presented any direct evidence that he was fired from his position because of his race;[6] however, the absence of direct evidence of discrimination is not fatal to Plaintiff's claim, as direct proof of discrimination rarely exists in this type of case. In such a situation, indirect evidence of discrimination may be presented through the McDonnell Douglas framework discussed herein.[7]

The United States Supreme Court articulated a three-part process for analyzing discrimination cases in McDonnell Douglas. First, the Plaintiff must establish a prima facie case of discrimination. Once a prima facie case has been established, a rebuttable presumption is created that the employer unlawfully discriminated against the Plaintiff. Second, once this presumption has been established, the burden of production shifts to the employer to show a legitimate, non-discriminatory reason for its actions. Third, if the employer shows a legitimate, non-discriminatory reason for its actions, the burden is then on the Plaintiff to come forward with evidence that the

---

[6]Plaintiff argues in his brief that two HRSA assessments outlining the racial tensions on the Board constitute direct evidence. However, this is not "direct" evidence that Plaintiff was later terminated because he is white, although it may help to raise an inference that that is what occurred. Direct evidence of race discrimination is evidence which, if believed, would prove the existence of a fact without any inferences or presumptions. O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 548-549 (4th Cir. 1995); rev'd on other grounds, 517 U.S. 308 (1996); Black's Law Dictionary, 460 (6th Ed. 1990) (citing State v. McClure, 504 S.W.2d 664, 668 (Mo.Ct.App. 1974); see Williams v. General Motors Corp, 656 F.2d 120, 130 (5th Cir. 1981), cert. denied, 455 U.S. 943 (1982).

[7]Pursuant to recent court rulings, consideration of Plaintiff's claim under the so-called "mixed-motive" analysis is also now allowed even though Plaintiff has presented only circumstantial, or in-direct, evidence of discrimination. Previously, consideration of a claim under the mixed-motive analysis was only proper in direct evidence cases. See Hill v. Lockheed Martin, 354 F.3d 277, 284-285 (4th Cir. 2004); Mereish v. Walker, 359 F.3d 330, 339-340 (4th Cir. 2004); cf. Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999) [en banc]. However, neither party has argued Plaintiff's claim under a mixed-motive analysis, and therefore no mixed-motive analysis has been performed.

6



employer's asserted reasons for its actions are a mere pretext for its true discriminatory motives, and that the actions of the employer were really based on the Plaintiff's race. McDonnell Douglas Corp., 411 U.S. at 802-805; Texas Dep't of Community Affairs, 450 U.S. at 252-256; Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 234-235 (4th Cir. 1991). Despite these shifting burdens of production, however, the Plaintiff retains the ultimate burden of persuasion on the issue of discrimination throughout. Texas Dep't of Community Affairs, 450 U.S. at 252-253; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

**1) Prima facie case.** As noted, in order to satisfy the first prong of the McDonnell Douglas three-part analysis, Plaintiff must establish a prima facie case of discrimination. In order to establish his prima facie case of disparate treatment, Plaintiff must establish the following: (1) that he is a member of a protected class; (2) that he was qualified for his job and that his performance was satisfactory; (3) that he was fired in spite of his qualifications and performance; and (4) that he was replaced by an individual outside of his protected class, or was otherwise dismissed under circumstances giving rise to an inference of unlawful discrimination. See generally, Causey v. Balog, 162 F.3d 795, 802 (4th Cir. 1998); Brinkley v. Harbour Rec. Club, 180 F.3d 598, 607 (4th Cir. 1999); St. Mary's Honor Ctr., 509 U.S. at 506.[8] Here, it is undisputed that Caucasians are a protected class.[9] The Defendant also has not disputed for

---

[8]The exact standard to be used in establishing a prima facie case is flexible depending on the factual situation and the claim alleged. Ennis v. National Ass'n of Business and Education Radio, Inc., 53 F.3d 55, 58 (4th Cir. 1995).

[9]Title VII prohibits discrimination against all groups, including majority groups (such as Caucasians) which have been historically favored. McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 279-280, 296 (1976). However, courts are split on whether a majority group plaintiff is entitled to the same inference of discrimination as a minority plaintiff when he or she proves a prima facie case. The Sixth, Seventh, Eighth, Tenth, and District of Columbia Circuits



have held that a reverse discrimination plaintiff only raises an inference of impermissible discrimination when he or she both satisfies the McDonnell Douglas prima facie test and also presents evidence of background circumstances to support the suspicion that the Defendant discriminates against majority groups.  See Ineichen v. Ameritech, ___F.3d ___, 2005 WL 1367203, *3 (7th Cir. June 10, 2005); Leadbetter v. Gilley, 385 F.3d 683, 690 (6th Cir. 2004); Hammer v. Ashcroft, 383 F.3d 722, 724 (8th Cir. 2004); Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004); Russell v. Principi, 257 F.3d 815, 818 (D.C.Cir. 2001); Lanphear v. Prokop, 703 F.2d 1311, 1315 (D.C.Cir. 1983). See also Gilbert v. Penn-Wheeling Closure Corp., 917 F.Supp. 1119, 1125 (N.D.W.Va. 1996); Tatum v. Philip Morris, Inc., 809 F.Supp. 1452, 1461-1462 (W.D.Okla. 1972), aff'd, 16 F.3d 417 (10th Cir. 1993), cert. denied, 511 U.S. 1083 (1994). The Third, Fifth, and Eleventh Circuits have held that a reverse discrimination plaintiff raises an inference of impermissible discrimination when he or she satisfies the McDonnell Douglas prima facie test.  See Iadimarco v. Runyon, 190 F.3d 151 (3rd Cir. 1999); Bass v. Board of County Commissioners, 256 F.3d 1095, 1103-1104 (11th Cir. 2001); Wilson v. Bailey, 934 F.2d 301, 304 (11th Cir. 1991); Byers v. Dallas Morning News, 209 F.3d 419, 426 (5th Cir. 2000).

     The Defendant cites a decision from this District which uses the heightened standard for "reverse discrimination" claims. Green v. Clarendon County School Dist., 923 F.Supp. 829, 840 (D.S.C. 1996). See also Youmans v. Manna, Inc., 33 F.Supp.2d 462 (D.S.C. 1998), aff'd, 166 F.3d 337 (4th Cir. 1998).  However, there is no Fourth Circuit decision on this issue. In Stock v. Universal Foods Corporation, 817 F.Supp. 1300 (D.Md. 1993), aff'd, 16 F.3d 411 (4th Cir. 1994), cert. denied, 115 S.Ct. 66 (1994), the District Court used the traditional McDonnell Douglas analysis. Id. at 1306. The Fourth Circuit upheld the District Court opinion on appeal in an unpublished opinion, but specifically left for another day a decision on the proper standard to be used.  See Stock v. Universal Foods Corporation, No. 93-1448, 1994 WL 10682 * 3, n. 2 (4th Cir. 1994) (unpublished), cert. denied, 115 S.Ct. 66 (1994); see also Lucas v. Dole, 835 F.2d 532, 534 (4th Cir. 1987) ["Although the D.C.Circuit has imposed a higher prima facie burden on majority plaintiffs, we expressly decline to decide at this time whether a higher burden applies."]; Cutshall v. Porter, 347 F.Supp.2d 228, 233 n. 2 (W.D.N.C. Dec. 1, 2004); Paris v. Arc/Davidson County, 307 F.Supp.2d 743, 755 (M.D.N.C. Feb. 25, 2004); Weeks v. Union Camp Corp., Nos. 98-2814, 2815, 2000 WL 727771 at **6 n. 13 (4th Cir. June 7, 2000).  For the reasons set forth by the District Court in Stock, at 1307, the undersigned has used the traditional McDonnell Douglas framework in analyzing the claims presented in this case. See also Hayes v. North State Law Enforcement Officers Ass'n, 10 F.3d 207 (4th Cir. 1993), where the Fourth Circuit cited favorably the following quote from Wygant v. Jackson Bd. of Educ., 476 U.S. 267, 273 (1986), "[T]he level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to discrimination." Hayes, 10 F.3d at 212. Accord, Adarand Constructors, Inc. v. Pena, 115 S.Ct. 2097, 2099-2104 (1995); see also Causey v. Balog, 929 F.Supp. 900, 909 (D.Md.1996); aff'd 162 F.3d 795 (4th Cir. 1998). Nevertheless, even if the Court chooses to use the heightened standard of review required in some circuits, the undersigned concludes that Plaintiff has still shown a triable issue



purposes of summary judgment that the Plaintiff was qualified for his job and that his performance was satisfactory.  However, the Defendant does dispute that Plaintiff was fired from his job, that he was replaced by an individual from outside of his protected class, or that there is otherwise any evidence giving rise to an inference of unlawful discrimination.

With respect to the issue of whether Plaintiff was fired from his position, Defendant strenuously argues that Plaintiff resigned, pointing to the resignation letter prepared by the Plaintiff on April 25, 2002. See Defendant's Exhibit 12.  Defendant also points to Plaintiff's statement to the Board during its executive session that the Center's programs were being held together by Dunn's vision and his energy, and "that if he left, I would go."; Plaintiff's Deposition, p. 45; and argues that Plaintiff's "voluntary resignation" in and of itself defeats his termination claim.

Plaintiff argues that he did not voluntarily resign, and that while he did state to the Board that he intended to leave if Dunn was fired, he clearly indicated to Center staffers the next day, including Center Chief Financial Officer Bob Reel as well as Board members Sutton and Hamrick, that he was not going to resign and would remain and fulfill his contract.  Plaintiff's Deposition, pp. 52-54; see also Plaintiff's Exhibit J.[10] Plaintiff further argues that during his meeting with Sutton and Hamrick on April 24, 2002, it was clear that Sutton was pursuing his

_____

of fact that he was discriminated against on the basis of his race sufficient to avoid summary judgment.

[10]Plaintiff's Exhibit J is a letter written by the Plaintiff to Dr. John Kehoe, Field Director of HRSA. See Plaintiff's Deposition, p. 68.  The HRSA had conducted the previously cited assessments of the Center shortly before Plaintiff was hired, both of which concluded that there was racial tension among the Board members, the majority of whom were African-American.  See Plaintiff's Exhibits A & B.  This letter was written shortly after Plaintiff left the Defendant's employment in April 2002.



dismissal, and that when he returned to work the next day (April 25, 2002), he was confronted again by Sutton. Plaintiff contends that he gave Sutton a written letter of resignation only because it was obvious that he was about to be fired (see Plaintiff's Exhibit I), at which time Sutton handed to him an already prepared letter from Wright accepting his resignation. See Plaintiff's Exhibit H. The Aiken County Sheriff's Department was then called to send a deputy to remove Plaintiff from the premises. See generally, Plaintiff's Exhibits J & K; Plaintiff's Deposition, p. 59. As for Defendant's argument that Plaintiff's oral statement to the Board was itself sufficient to constitute a resignation, Plaintiff notes that his employment contract provided that it could be terminated by either party only "upon ninety (90) days *written* notice." See Plaintiff's Exhibit G, ¶ 10. [emphasis added]. Plaintiff argues that these facts, construed in the light most favorable to him, show that he did not voluntarily resign his position, but was instead forced out by the Board.[11]

The undersigned agrees that this evidence creates a sufficient issue of fact as to whether Plaintiff was effectively fired from his position to defeat summary judgment on this ground. See Garrett v. Hewlett Packard Co., 305 F.3d 1210, 1221 (10th Cir. 2002) ["Constructive discharge occurs 'when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign'....]; Bristow v. Daily Press, Inc., 770 F.2d 1251, 1255 (4th Cir. 1985); Blistein v. St. John's College, 74 F.3d 1459, 1468 (4th Cir. 1996), overruled in part on other grounds, Oubre v. Entergy Operations, Inc., 522 U.S. 422, 428 (1998); *cf.* EEOC v. Service News, Co., 898 F.2d 958, 962 (4th Cir. 1990) [actual use of the words "fired" or "discharged" not required to support a discharge claim].

---

[11]Again, when considering *Plaintiff's* motion for summary judgment, Defendant's evidence is that Plaintiff was not told that he would be fired if he did not resign, and that Plaintiff quit voluntarily.



With respect to the remaining elements of his prima facie case, Plaintiff argues that he was replaced by an individual from outside of his protected class (Dr. Paul Weston, an African-American). Defendant does not contest that Dr. Weston eventually became the new medical director, but argues that Plaintiff was first replaced by Dr. Deloris Foley, a white female. See Plaintiff's Deposition, pp. 102-103; Carroll Deposition, pp. 37-38. The dispute between the parties is apparently over whether Foley was just an interim selection pending the naming of a new permanent medical director; i.e., Dr. Weston. [12] But see Greene v. Safeway Stores, Inc., 98 F.3d 554, 561 (10th Cir. 1996) ["Further, the circumstances would reasonably support an inference that King was to serve as a temporary replacement who, as an older person, would be a defense against any age discrimination claim by [Plaintiff]."]. However, at least two Board members, Lester Smalls and Jack Hamrick, testified that Plaintiff was replaced as Medical Director by Dr. Weston, not Dr. Foley. Hamrick Deposition, pp. 37-38; Smalls Deposition, p. 21. This evidence is sufficient to raise a genuine question of fact concerning this issue.

As additional evidence to give rise to an inference of unlawful discrimination, Plaintiff also cites to the two assessments performed by the HRSA shortly before Plaintiff was hired by Dunn. Both of these assessments (which were both done by African-Americans)[13] reflect that race was a major issue for the members of the Board, with some members of the Board expressing a concern or belief that the Center "may be taken over by the white medical

---

[12]There is evidence in the record to reflect that Dr. Foley had previously served on an interim basis as Medical Director, after Plaintiff's predecessor was terminated and pending Plaintiff's hiring. See Plaintiff's Exhibit B, p. 7, ¶ 2.

[13]Defendant has not contested Plaintiff's representation to the Court that both of these individuals are African Americans.

11



community, thus African-American Board members are encouraged to 'vote Black' on Board related matters, regardless of merit." See Plaintiff's Exhibit A, pp. 2-3. These assessments further reflect that while the Executive Director (Dunn) and the Chief Financial Officer were doing a good job running the Center, the members of the Board showed little interest in organizational or service delivery issues, with Board minutes being devoted to political issues and power plays by some Board members. One of these assessments also talks extensively about Dunn's efforts to remove Plaintiff's predecessor as medical director, an African-American female, and of the Board's refusal to back him in his position. See Plaintiff's Exhibit A, at pp. 5-6. In the second of the two assessments (dated December 2001), the consultant concluded

> there still exist in-fighting among the Board of Directors. Race continues to be a major issue. There is a concern that the Center, which was established by an African-American, would lose its identity. Control of the Center/Board by African-American[s] appears to be an issue for some but not all of the African-Americans currently on the Board.

See Plaintiff's Exhibit B, at p. 3.

That assessment further noted that the Board had improperly intervened to reinstate the medical director (Plaintiff's predecessor) after she had been dismissed by Dunn, and that the Board had not followed its own rules in this regard. Id, at p. 4. The consultant noted that "[a]ccusation[s] of racism and efforts to stack the Board with supporters of the CEO and/or more Whites were suggested during interviews." The evidence (considered in the light most favorable to the Plaintiff) then further reflects that the Board removed Dunn (who according to the consulting reports was doing a good job), which was then followed by Plaintiff's forced resignation. Dunn was then replaced as CEO by an African-American, and whatever Foley's status following Plaintiff's leaving the position of Medical Director, is undisputed that she served



12

only a short period of time before Plaintiff was also permanently replaced as Medical Director by an African-American.

Considered in the light most favorable to the Plaintiff, this evidence is sufficient to give rise to an inference of discrimination at the prima facie stage of review. <u>Texas Dep't of Community Affairs</u>, 450 U.S. at 253 [the burden of establishing a prima facie case is not onerous]; <u>see</u> <u>Proud v. Stone</u>, 945 F.2d 796, 798 (4th Cir. 1991) [when considering whether a Plaintiff has presented a prima facie case under the <u>McDonnell Douglas</u> proof scheme, a Court should "…resist the temptation to become so entwined in the intricacies of the proof scheme [set out in <u>McDonnell Douglas</u>] that [it] forget[s] that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination <u>vel</u> <u>non</u>'."]. Therefore, Plaintiff having submitted sufficient evidence to establish his termination prima facie case, the Court must turn to consideration of the next prong of the <u>McDonnell Douglas</u> proof scheme.

**2) Legitimate, non-discriminatory reason**. Under the second prong of the <u>McDonnell Douglas</u> proof scheme, the inference of discrimination created by the establishment of a prima facie case may be rebutted by the Defendant if it sets forth a legitimate, non-discriminatory reason for its actions. <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 239 (4th Cir. 1982). Here, the Defendant has presented evidence to show that Plaintiff had indicated orally to the Board that if Dunn was fired, he would leave, and that two (2) days later he submitted a written letter of resignation giving ninety (90) days notice as provided for under his employment contract. Defendant also notes that neither of the HRSA consultants identified a specific incident where race was used by the Board as a hiring decision.

This evidence is sufficient to establish a legitimate, non-discriminatory reason for



13

the employment action taken by the Defendant. <u>EEOC v. Clay Printing Co.</u>, 955 F.2d 936, 941 (4th Cir. 1992). [ADEA case] [The defendant's burden in establishing a legitimate, non-discriminatory reason is only one of production, not of persuasion.].

 **3) <u>Pretext</u>**.  Under the third prong of the <u>McDonnell Douglas</u> proof scheme, when a Defendant employer rebuts the employee's inference of discrimination by demonstrating a legitimate, non-discriminatory reason for the employment decision, the Plaintiff/employee must demonstrate by a preponderance of the evidence that the employer's proffered reason is a mere pretext for discriminatory conduct. To make this demonstration, Plaintiff must show that "but for" his employer's intent to discriminate against him because of his race, he would not have suffered the adverse employment action.  <u>EEOC</u>, 955 F.2d at 941; <u>Conkwright</u>, 933 F.2d at 234.  "Direct or indirect evidence of discriminatory motive may do, but 'the evidence as a whole . . . must be sufficient for a reasonable fact-finder to infer that the employer's decision was motivated by [race animus].'" <u>LeBlanc v. Great American Insurance Co.</u>, 6 F.3d 836, 843 (1st Cir. 1993)(citing <u>Goldman v. First Nat'l Bank</u>, 985 F.2d 1113, 1117 (1st Cir. 1993)(quoting <u>Connell v. Bank of Boston</u>, 924 F.2d 1169, 1172, n. 3 (1st Cir. 1991), <u>cert. denied</u>, 111 S.Ct. 2828 (1991)); <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 141-143 (2000).

 After careful consideration of the evidence and arguments presented in the light most favorable to the Plaintiff, the undersigned finds that a sufficient issue of pretext has been presented with respect to the employment decision made by the Defendant for the Plaintiff to survive summary judgment.  Considered in the light most favorable to the Plaintiff, the evidence shows that Plaintiff was hired by Dunn to be Chief Medical Director on February 28, 2002, to begin work as Medical Director on March 4, 2002.  The evidence further shows that at the time Plaintiff

14



was hired, the Board of Directors (which was majority African-American) had a strained working relationship with Dunn (Caucasian), that it had recently attempted to overrule Dunn's decision to terminate Plaintiff's predecessor as Medical Director (an African-American), and that many African-American members of the Board were suspicious or fearful that whites were attempting to, in effect, take over the Center and its operations.   The evidence also reflects that, even though the HRSA assessments show that Dunn was doing a good job as CEO, he was fired by the Board shortly after Plaintiff had begun his job as Medical Director, and was replaced as CEO by an African-American. Further, although Plaintiff orally told the members of the Board (during the meeting at which Dunn was later fired) that if Dunn was fired, he would leave, he decided after learning of Dunn's dismissal that he would stay in his position, and relayed that information to staff members, the Defendant's CFO, as well as to at least two Board members the next day.  However, during Plaintiff's meeting with those two Board members, he was told that they believed his hiring by Dunn had been illegal or improper, was called a racist by one of the Board members (an African-American), and was either directly told (or it was implied) that if he did not resign he was going to be fired.  Plaintiff then prepared a letter of resignation the next day, and when he gave it to the Board member (the same Board member who had called him a racist the previous day), that Board member handed him a pre-prepared letter from the Board Chairwoman accepting his written resignation.  A sheriff's deputy was then called, and Plaintiff was escorted off the premises.  Plaintiff was then permanently replaced as Medical Director by an African-American.

While the undersigned does not intend to minimize the evidence submitted by the Defendant in opposition to Plaintiff's claims, the undersigned does not find that, considered in the light most favorable to the Plaintiff,  "[n]o  reasonable trier of fact could conclude that [race] was



more likely than not a motivating factor" in the Defendant's employment decision under the evidence submitted. <u>Spratley v. Hampton City Fire Dept.</u>, 933 F.Supp. 535, 542 (E.D.Va. 1996), <u>aff'd</u>, 125 F.3d 848 (4th Cir. 1997); <u>see</u> <u>Conkwright</u>, 933 F.2d at 234 ["[I]ndirect evidence of discriminatory motive may do [as long as it is] sufficient for a reasonable factfinder to infer that the employer's decision…was motivated by [race animus]"]; <u>see</u> <u>Reeves</u>, 530 U.S. at 135 [setting forth the general proposition that where a plaintiff presents a prima facie case together with sufficient evidence to raise an inference that the employer's asserted justification for the employment decision is false, a trier of fact can conclude that the employer unlawfully discriminated].

Therefore, Defendant's motion for summary judgment with respect to Plaintiff's race discrimination claim should be denied. As the evidence presents a genuine question of fact on this issue, however, Plaintiff's motion for summary judgment should also be denied.

## II.

### (Breach of Contract Claim)

In his third cause of action, Plaintiff asserts a claim for breach of contract. Plaintiff alleges that he had a contract for employment with the Defendant, that he fulfilled his obligations under the contract, and that the Defendant breached his employment contract when he was "constructively terminated from his position under a forced resignation and police escort from Defendant's building." <u>Complaint</u>, at ¶¶ 70. Defendant argues that it is entitled to summary judgment on this claim because Plaintiff voluntarily resigned from his position, and also because he breached the terms of his contract by signing a Physician Practice Development and Service Agreement with the Aiken Regional Medical Center on April 3, 2002, while he was still employed



16

with the Center.[14]

"In order to prevail on his claim of breach of contract, Plaintiff bears the burden of establishing the existence and terms of the contract, Defendant's breach of one or more of the contractual terms, and damages resulting from the breach." Taylor v. Cummins Atlantic, Inc., 852 F.Supp. 1279, 1286 (D.S.C. 1994), citing Fuller v. Eastern Fire & Cas. Ins. Co., 124 S.E.2d 602, 610 (S.C. 1962). Here, the evidence shows that Plaintiff had an employment contract with the Defendant for a term of twelve (12) months, which included a 90 day written notice clause. For the reasons set forth more fully in Section I of this Report and Recommendation, supra, the undersigned finds that there is a genuine issue of fact as to whether there was a breach of the employment contract in this case, and, if so, which party is responsible for that breach. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 259 (1986) ["Credibility determinations, the weighing of evidence, and the choosing of inferences from the facts" are functions of the jury]; Muhammad v. Klotz, 36 F.Supp.2d 240, 243 (E.D.Pa. 1999) ["Thus, at the summary judgment stage the only inquiry is the threshold one of determining whether there is a need for a trial, that is, 'whether the evidence presents a sufficient disagreement to require submission to [the jury] or whether it is so one-sided that one party must prevail as a matter of law'"], citing Anderson, 477 U.S. at 250-252. Therefore, neither party is entitled to summary judgment on this claim.

---

[14]The date of April 3, 2002 written next to Plaintiff's signature appears to be a scrivener's error. The Agreement states that it was entered on August 1, 2002, and the other parties to this contract signed it on July 3, 2002, and July 9, 2002, respectively. See Plaintiff's Exhibit Q. See also, n. 16, infra.



### III.

### (Defamation Claim)

In his fourth cause of action, Plaintiff asserts a claim for defamation <u>per se</u>. Specifically, Plaintiff alleges that when he "was constructively terminated from his position and escorted from Defendant's building by a deputy sheriff, Plaintiff was defamed by Defendant's actions." Plaintiff further alleges that "[t]he obvious implication to any onlooker, including peers, staff, employees, and patients, was that Plaintiff had engaged in criminal activity or threatened to do so, such that the presence of armed law enforcement was necessary to secure his removal. In fact, Plaintiff had not engaged in any conduct which would make this show of force necessary." Plaintiff alleges that this conduct constituted defamation <u>per se</u>, because "the conduct of Defendant herein held Plaintiff to disrepute within his profession." <u>See</u> <u>Complaint</u>, ¶¶ 79-88.

In South Carolina, the elements of defamation[15] include: 1) a false and defamatory statement concerning another; 2) an unprivileged publication to a third party; 3) fault on the part of the publisher; and 4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. <u>Murray v. Holnam, Inc.</u>, 542 S.E.2d 743, 748 (S.C.Ct.App. 2001). "[D]efamation allows a plaintiff to recover injury to [his] reputation as the result of the defendant's communication to others of a false message about the plaintiff....The defamatory meaning of a message or statement may be obvious on the face of the statement, in which case the statement is defamatory <u>per se</u>." <u>Holtzscheither v. Thomason Newspapers, Inc.</u>, 506

---

[15]Defamatory communications can take two forms: libel and slander. Slander is a spoken defamation, while libel is a written defamation or one accomplished by actions or conduct. <u>Swinton Creek Nursery v. Edisto Farm Credit</u>, 514 S.E.2d 126, 133-134 (S.C. 1999). Here, the defamation alleged in the Complaint could fall under both forms; Sutton's verbal statements that Plaintiff might be stealing something, and also the non-verbal actions or conduct alleged.

18



S.E.2d 497, 508-509 (S.C. 1998); see also Swinton Creek Nursery, 514 S.E.2d at 134.  Further, allegedly defamatory actions which falsely charge an individual with the commission of a crime of moral turpitude, or unfitness in one's business or profession, are actionable per se.  Goodwin v. Kennedy, 552 S.E.2d 319, 322-323 (S.C.Ct.App. 2001).

Defendant argues that a sheriff's deputy was called for safety and security reasons only, that Plaintiff was treated no differently than others who separated from employment with the Center, and that the Defendant's decision to follow its practice of having law enforcement available was prudent and not defamatory.  However, while the mere act of disciplining and/or discharging an employee is not actionable defamation as a matter of law; see generally, Brewer v. Metropolitan Atlanta Rapid Transit Auth., 419 S.E.2d 60, 61 (Ga.Ct.App. 1992) [mere act of disciplining and discharging employee is not defamatory as a matter of law]; in this case the evidence before the Court (considered in the light most favorable to the Plaintiff) shows that not only was a sheriff's deputy called to come get the Plaintiff and escort him from the property, but that Sutton also accused Plaintiff of stealing and was "shouting down the hall that [Plaintiff] was a thief....He was going to put a stop to it".  Plaintiff's Deposition, p. 56. See also Holtzscheither, 506 S.E.2d at 501 ["An example of defamation per se is 'A is a thief.'"].

A finder of fact could conclude from this evidence that a false and defamatory statement was made, that it was published to a third party or parties by an agent of the Defendant, and that the defamatory meaning of the message or statement was obvious on the face of the statement and actionable per se because it charged Plaintiff with the commission of a crime of moral turpitude or signaled Plaintiff's unfitness in his business or profession.  Therefore, Defendant's motion for summary judgment with respect to Plaintiff's defamation claim should be denied.

19



Plaintiff's motion, however, should also be denied, as the meaning of these events (considered in the light most favorable to the Defendant) is subject to interpretation, and is therefore for the finder of fact to determine.  Anderson, 477 U.S. at 259; Muhammad, 36 F.Supp.2d at 243.

## IV.

### (Claim for Invasion of Privacy)

In his fifth cause of action, Plaintiff alleges that the Defendant released his employment file and application for employment to the press without authorization and with the specific intent to attempt to cause harm, as these documents contained personal information to which the Plaintiff had a right and an expectation of privacy.  This claim arises out of Board Member Hamrick's release of information from Plaintiff's personnel file to Carl Langley, a reporter for the Aiken Standard Newspaper.  Langely Deposition, pp. 13-15.  Langley testified that when the Board member gave him this information (which included information about past substance abuse and medical treatment), the Board member made the comment that "there is more to Dr. Moore than meets the eye." Id, p. 16.  Langley testified that the Board Member expected him to publish this information, although he did not specifically say that Langley was being given this information in order to humiliate the Plaintiff.  Id, p. 18.  Langley did testify, however, that the Board Member told him that this information could be used as "a control on [the Plaintiff], or something or other." Id, p. 30.  Langley testified that he then told Plaintiff that he had been given this information, but that following a meeting with the Plaintiff he decided not to use the information in a story. Langley also testified that he did not show this material to anyone else. Id, pp. 19-21, 26-31.

There are three theories under which an invasion of privacy claim can be brought: wrongful appropriation of personality, wrongful publicizing of private affairs, and wrongful



intrusion into private affairs. <u>Doe 2 v. The Associated Press</u>, 331 F.3d 417, 421 (4th Cir. 2003); <u>Sloan v. South Carolina Dep't of Public Safety</u>, 586 S.E.2d 108, 100 (S.C. 2003); <u>Swinton</u>, 514 S.E.2d at 130.  Here, Plaintiff's invasion of privacy claim is for wrongful intrusion into private affairs.  This concept encompasses the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities, or which involves an unreasonable and highly offensive intrusion upon the seclusion of another. <u>O'Shea v. Lesser</u>, 416 S.E.2d 629 (S.C. 1992), citing <u>Meetze v. The Associated Press</u>, 95 S.E.2d 606 (S.C. 1956).

"When a plaintiff bases an action for invasion of privacy on 'intrusion' alone, bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." <u>Rycroft v. Gaddy</u>, 314 S.E.2d 39, 43 (S.C. 1984), citing <u>Shorter v. Retail Credit Co.</u>, 251 F.Supp. 329 (D.S.C. 1966).  Here, there was no public disclosure, as Langley testified he was the only one who received the information and he did not share it with anyone else, nor did he write a story using this information.  *Cf.* <u>Swinton</u>, 514 S.E.2d at 132-133 [more than disclosure to a single individual required to constitute public disclosure]; <u>Rycroft</u>, 314 S.E.2d at 43.  Therefore, in order for the Plaintiff to survive summary judgment on this claim, the evidence must be sufficient to at least create a genuine issue of fact as to whether the disclosure of this information to Langley showed a blatant and shocking disregard of Plaintiff's rights, resulting in serious mental or physical injury or humiliation to the Plaintiff.

Considering the evidence in the light most favorable to the Plaintiff, Hamrick's motives and conduct in providing this admittedly confidential material to a newspaper reporter could



constitute a blatant and shocking disregard of Plaintiff's rights, at least sufficient to survive summary judgment. Whether Plaintiff has presented sufficient evidence to satisfy the second prong of his wrongful intrusion claim is more problematic. It is unclear in the medical evidence whether Plaintiff suffered any serious mental or physical injury specifically as a result of Hamrick's actions. However, Plaintiff did testify that:

> It was humiliating, absolutely humiliating and embarrassing. Had Carl Langley not been an honorable person, it could have been devastating. It could have been impossible for me to practice in Aiken County because we are a very small community.

Plaintiff's Deposition, p. 95.

Plaintiff further testified that, although he felt humiliation at the release of this information, he also believed that the person to whom this information was disseminated (Langley) acted honorably. Id., pp. 91-92.

Whether the humiliation Plaintiff felt by virtue of the fact that Langley had himself seen and reviewed this material was sufficiently "severe" to rise to the level of humiliation necessary to support this cause of action is, as previously noted, problematic. At this point, the undersigned is satisfied to allow this claim to proceed (considering the evidence in the light most favorable to the Plaintiff), as the Court may always issue a directed verdict on this claim if the evidence at trial does not convince the Court that this claim is viable. Therefore, neither party should be granted summary judgment on Plaintiff's invasion of privacy claim at this time.

## V.

### (Intentional Infliction of Emotional Distress)

In his sixth and final cause of action, Plaintiff alleges that the Defendant's "course and pattern of dealing" caused him to suffer severe mental anguish and emotional distress, and that



"the conduct of Defendant...was so outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable that no reasonable man or woman could be expected to endure it." Plaintiff's Complaint, pp. 97-103.

The language of Plaintiff's Complaint tracts the law in this State. Under South Carolina law, in order to recover on a claim for intentional infliction of emotional distress, Plaintiff must demonstrate that the Defendant's conduct was so extreme and outrageous that it exceeded all possible bounds of decency, and that the emotional distress suffered by the Plaintiff was so severe that "no reasonable [person] could be expected to endure it." See Wright v. Sparrow, 381 S.E.2d 503, 505 (S.C.Ct.App. 1989); Ford v. Hutson, 276 S.E.2d 776, 778 (S.C. 1981); Shipman v. Glenn, 443 S.E.2d 921 (S.C.Ct.App. 1994); Gattison v. South Carolina State College, 456 S.E.2d 414 (S.C.Ct.App. 1995). However, after careful consideration of the evidence submitted, the undersigned concludes that Plaintiff has not presented sufficient evidence to show that the Defendant's conduct rose to the necessary level of extreme and outrageous conduct to prevail on this claim.

Considered in the light most favorable to the Plaintiff, the evidence shows that two of the Defendant's Board members came to the Plaintiff's workplace the day after he had indicated he would resign if Dunn was terminated, and, among other comments, told him that was a "racist" and indicated that if he did not resign he would be fired. The next day, Board member Sutton called a sheriff's deputy to have Plaintiff escorted off the property, and "shout[ed] down the hall that [Plaintiff] was a thief". Shortly thereafter, another Board member (Hamrick) gave material out of Plaintiff's personnel file to a newspaper reporter, although this material was never used or published.



While such conduct, if true, may be sufficient to establish Plaintiff's claim that he was constructively discharged, or that a breach of contract occurred, or even that he was defamed or his privacy was violated, such conduct is not sufficient (even assumed to be true for purposes of summary judgment) to meet the high standard for establishing Plaintiff's outrage claim under South Carolina law.  Being fired from one's job, even under the less than pleasant circumstances alleged here, is simply not sufficient to defeat summary judgment on this claim under the applicable caselaw. Even the humiliation Plaintiff may have felt upon learning of the release of his permanent records to Langley is not, by itself, sufficient to satisfy the requirements of this cause of action. <u>See generally</u>, <u>Wright</u>, 381 S.E.2d at 505 [In order to recover on a claim for intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant's conduct was so extreme and outrageous that it exceeded all possible bounds of decency, and that the emotional distress suffered by the plaintiff was so severe that "no reasonable [person] could be expected to endure it."]; <u>Ford</u>, 276 S.E.2d at 778; <u>Shipman</u>, 443 S.E.2d at 923; <u>Champion Road Machinery International Corporation v. Jackson</u>, 324 S.E.2d 79, 81 (1984), citing <u>Hudson v. Zenith Engraving Company, Inc.</u>, 259 S.E.2d 812, 814 (1979) [In South Carolina, a plaintiff can only succeed on a claim for intentional infliction of emotional distress "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."]; <u>Johnson v. Dailey</u>, 457 S.E.2d 613 (S.C. 1995) [teacher's allegations that her supervisor engaged in a campaign of retaliatory harassment against her after she reported his unlawful activities to authorities insufficient to support claim for outrage]; <u>Jones v. Clinton</u>, 990 F.Supp. 657, 678 (E.D.Ark. 1998) [conclusory statement by counselor that Plaintiff experienced various symptoms as a result of alleged sex



24

discrimination insufficient to establish severe emotional distress component.]; <u>Gattison</u>, 456 S.E.2d at 416-417 [even verbally abusive accusations in the business setting do not give rise to a claim for intentional infliction of emotional distress]; <u>Folkens v. Hunt</u>, 348 S.E.2d 839, 845 ( S.C.Ct.App. 1986); <u>Wright</u>, 381 S.E.2d 505-506 [allegations that employer plotted to build a case to justify firing employee by loading her with responsibility while stripping her of authority, changing the way she should perform her duties and accusing her of not following directions, insufficient to assert a claim for intentional infliction of emotional distress]; <u>Shipman</u>, 443 S.E.2d at  922-923 [supervisor's conduct in ridiculing speech impediment of and threatening to fire an employee who had cerebral palsy did not provide a sufficient basis for intentional infliction of emotional distress]; <u>Wilkes v. Young</u>, 28 F.3d 1362, 1366 (4th Cir. 1994); <u>Craig v. Andrew Aaron & Associates, Inc.</u>, 947 F.Supp. 208, 212-213 (D.S.C. 1996).

   Therefore, Defendant is entitled to summary judgment on Plaintiff's claim for intentional infliction of emotional distress.

<h2 style="text-align:center">VI.</h2>

<h3 style="text-align:center">(Defendant's Counterclaims)</h3>

   In its responsive pleading, Defendant has asserted counterclaims against the Plaintiff for breach of the covenant not to compete, restitution, and abuse of process.

   **Breach of covenant not to compete.**  Defendant alleges in its first counterclaim that Plaintiff's employment contract included a covenant not to compete, and that Plaintiff breached this covenant when he signed a physician service agreement with the Aiken Regional Medical Center for Plaintiff to open up a private practice.  Defendant further alleges that Plaintiff hired two employees from the Center to come work for him when he opened his practice.  <u>Plaintiff's</u>



Deposition (2004), pp. 49-50.  Both parties have moved for summary judgment with respect to this claim.

It is undisputed that Plaintiff's employment contract with the Defendant included a covenant not to compete, and that under South Carolina law such covenants, although generally disfavored, are enforceable as long as certain criteria are met.  See generally, Rockford Manufacturing Ltd. v. Bennet, 296 F.Supp.2d 681, 686 (D.S.C. 2003); Cafe Associates Ltd. v. Gerngross, 406 S.E.2d 162, 164 (S.C. 1991).  However, in this case there is a question of fact as to whether it was the Defendant or the Plaintiff who violated the terms of Plaintiff's employment contract.  See Discussion, supra.  Further, while Defendant argues that Plaintiff signed the physician's agreement with Aiken Regional before he left the Defendant's employ, this issue is in dispute,[16] while it is undisputed that Plaintiff did not actually open a private physician's practice until after he had left the Defendant's employ.

If the Defendant effectively fired Plaintiff from his position without cause and without proper notice, then the covenant not to compete in his employment contract may not be valid and enforceable.  Conversely, if the trier of fact were to find that it was the Plaintiff who violated his employment contract by failing to give proper notice or that he voluntarily resigned his position, then the trier of fact could also find that Plaintiff opening a private practice in the Aiken area violated the contract's covenant not to compete, although it would still be necessary for the

---

[16]As previously noted; see p. 17, n. 14; the date of April 3, 2002 written by Plaintiff's signature appears to be a scrivener's error.  The Agreement itself states that it was entered into on August 1, 2002, and the other parties to this contract signed it on July 3, 2002, and July 9, 2002, respectively. See Plaintiff's Exhibit Q; Plaintiff's Deposition, pp. 35-36; Plaintiff's Deposition (2003), p. 137; Justyn Deposition, p. 10.  Further, the attorney who drafted the Agreement for the hospital testified that the Agreement was not drafted until June 2002. Gilbert Deposition, p. 7.



Defendant to show damages. <u>Depositions and....,Inc. v. Campbell</u>, 406 S.E.2d 390, 391 (S.C.Ct.App. 1991) [Employer was required to show specific instances in which former employee violated covenant not to compete and profits she obtained as result of those violations in order to recover damages for breach.]. *Cf.* <u>Sermons v. Caine   & Estes</u>, 273 S.E.2d 338 (1980) [covenant unenforceable if it is not necessary for the protection of the legitimate business interest of the employer].[17]

Therefore, neither party is entitled to summary judgment on this claim.

**Claim for restitution.**   Defendant's counterclaim for restitution is based on Plaintiff's alleged failure to repay a salary advance.  Plaintiff concedes that he was advanced one pay period's (two weeks) salary in the amount of $5,384.62 at the time he began his employment. <u>See</u> <u>Plaintiff's Exhibit D</u>; <u>see</u> <u>also</u> <u>Defendant's Exhibit 10</u>.  This amount was to be deducted by the Center against the Plaintiff's remaining year's salary.

A claim for restitution is valid in South Carolina.  In order to succeed on this claim, the Defendant must show that it conferred a non-gratuitous benefit on the Plaintiff, that Plaintiff realized some value from this benefit, and that it would be inequitable for Plaintiff to retain the benefit and not pay the Center back. <u>Niggel Associates, Inc. v. Polo's of North Myrtle Beach, Inc.</u>, 374 S.E.2d 507, 509 (S.C.Ct.App. 1988); <u>see</u> <u>Sauner v. Public Service Authority of South Carolina</u>, 581 S.E.2d 161, 168 (S.C. 2003) [restitution is a remedy designed to prevent unjust enrichment]. Plaintiff does not deny that he has not repaid this advance; however, Plaintiff also argues that he is owed money by the Defendant for insurance coverage and moving expenses, as well as for accrued

---

[17]The evidence presented to the Court shows that Plaintiff's private practice failed. <u>See</u> <u>Plaintiff's Exhibits R and S</u>.  There is no evidence of actual damages sustained by the Defendant in the record.



vacation and leave time.  <u>See</u> <u>Plaintiff's Exhibit C</u>.  Plaintiff also notes that the Defendant was going to obtain repayment for the advance by reducing the amount of his twice monthly paychecks, and that how much Plaintiff was paid and how much Plaintiff may still owe on this salary advance under the evidence submitted, if any, is in question.  <u>See</u> <u>Plaintiff's Exhibit D</u>.

Of course, the answer to this question may depend on who is ultimately determined to have breached the employment contract, if anyone, as the respective financial obligations of the parties will depend on the validity or enforceability of the terms of that contract.  Therefore, based on the information before the Court, both party's motions for summary judgment with respect to this counterclaim should be denied at this time.  A full financial accounting can be completed at the end of the case, taking into consideration the ultimate findings of the trier of fact on the Plaintiff's breach of contract claim.

**Claim for abuse of process.**   In its final counterclaim, Defendant alleges that Plaintiff has committed the tort of abuse of process by filing a complaint in state court prior to the issuance of the EEOC's determination on his administrative claim.  With respect to this claim, it is undisputed that Plaintiff filed his administrative charge of discrimination with SCHAC on October 30, 2002, and that on December 20, 2002 he filed a state court action prior to receipt of any right to sue letter from either SCHAC or the EEOC.  Then, following receipt of a right to sue letter on January 16, 2004, Plaintiff filed a dismissal without prejudice of his state court case on February 3, 2004.  Defendant alleges that Plaintiff's sole goal in pursuing this strategy was to drive up the Defendant's costs to defend against litigation, that Plaintiff's failure to engage in settlement negotiations in his state case shows he wasn't seriously pursuing it, and that his state court case was only filed for the "ulterior purpose of bolstering his federal court strategy."



28

In order to pursue an action for abuse of process, the Defendant must show that Plaintiff had an ulterior purpose in instituting his state court lawsuit, and that he committed a willful act which was not proper in his conduct of those proceedings.  Hainer v. Am.Med.Int'l, Inc., 492 S.E.2d 103, 107 (1997) ["Some definite act or threat not authorized by the process or aimed at an object not legitimate in the use is required...Abuse of process requires both an ulterior purpose and a willful act not proper in the regular course of the proceeding."].  However, in this case Plaintiff argues that he has stipulated that all discovery and all information gathered in the state court action could be utilized in this federal case, and Defendant has presented no argument to counter this statement. As for Defendant's argument that the Plaintiff showed bad faith by not attempting any settlement negotiations in that state case, the undersigned notes that *both parties* have declined mediation for the purpose of possible settlement in the case at bar. This argument is not sufficient to create a genuine issue of fact as to whether Plaintiff willfully abused the process in filing his state case.

Defendant has presented no evidence to justify this claim, but has instead presented only rank speculation and innuendo. See Contemporary Mission v. United States Postal Serv., 648 F.2d 97, 107, n.14 (2d Cir. 1981) [An "opposing party's facts must be material and of a substantial nature, not fanciful,...conjectural, speculative, nor merely suspicions"] (internal citations and quotation marks omitted); Kulak v. City of New York, 88 F.3d 63, 71 (2nd Cir. 1996) ["conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment"]; Nicolo v. Philip Morris, Inc., 201 F.3d 29, 33 (1st Cir. 2000) [Conjectural allegations and conclusory assertions do not suffice to establish a genuine issue of fact].  Plaintiff having commenced a legal action in state court or causing process to issue is not sufficient to give rise to

29



this cause of action. Rather, only evidence of a misuse or misapplication of that legal process is sufficient. <u>Hainer</u>, 492 S.E.2d at 107 ["There is no liability where the [Plaintiff] has done nothing more than carry out the process to [an] authorized conclusion, even though with bad intentions"]; *Cf.* <u>Johnson v. Painter</u>, 307 S.E.2d 860 (S.C. 1983); <u>Whitfield Construction Co. v. Bank of Tokyo Trust Co.</u>, 525 S.E.2d 888 (S.C.Ct.App. 1999).   As Defendant has presented no such evidence, Plaintiff's motion for summary judgment should be granted on this cause of action.

### Conclusion

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment with respect to Plaintiff's sixth cause of action (Intentional Infliction of Emotional Distress) be **granted**, and that Plaintiff's motion for summary judgment with respect to Defendant's third counterclaim (Abuse of Process) also be **granted**.   It is further recommended that both the Plaintiff's and Defendant's motions for summary judgment with respect to the remaining causes of action and counterclaims be **denied**.

_____
Bristow Marchant
United States Magistrate Judge


Columbia, South Carolina

July  14,  2005

30